

U.S. Department of Justice

United States Attorney
Eastern District of New York

SDD/SPN
F. #2014R00158

271 Cadman Plaza East
Brooklyn, New York 11201

June 8, 2018

**TO BE FILED UNDER SEAL**
(Redacted Version Filed Publicly)

By Hand and ECF

Honorable Jack B. Weinstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. John Doe
      Criminal No. 14-612 (JBW)

Dear Judge Weinstein:

    The government respectfully submits this letter in connection with the sentencing of the defendant in the above-referenced case, which is scheduled for June 27, 2018. On November 26, 2014, the defendant pled guilty, pursuant to a cooperation agreement with the government, to a two-count information charging him with provision of material support to ISIS, a designated foreign terrorist organization, in violation of Title 18, United State Code, Section 2339B, and receipt of military-type training from a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339D. The government submits this letter, pursuant to United States Sentencing Guidelines ("Guidelines") Section 5K1.1 and Title 18, United States Code, Section 3553(e), to inform the Court of facts relevant to the defendant's sentence and to permit the Court to impose, in its discretion, a sentence below the applicable statutory mandatory minimum and the advisory Guidelines range. Although his crimes are very serious, as discussed further below, the defendant has provided substantial assistance to the government, which has significantly contributed to the national security of the United States.

## I. Background

The defendant unquestionably has committed serious crimes, which the government has a strong interest in deterring. As discussed further below, however, the defendant also has provided substantial and unique assistance to the government that has materially contributed to the national security of the United States ▮. Such assistance is relevant to the Court's determination of an appropriate sentence in this case. As set forth in the Presentence Investigation Report ("PSR"), the defendant's personal history is typical in many ways but unusual in some important respects. The defendant came to the United States from Bangladesh at the age of one and became a naturalized U.S. citizen. His childhood was fairly normal. He played sports and attended school as well as regular religious classes, where he studied and learned the tenets of the Muslim faith. (PSR ¶ 4). He had friends. He was occasionally ostracized. He had ups and downs in both his familial and social relationships. The defendant had the capacity to do very well in school but appears to have underperformed academically in high school and, initially, college. His academic challenges were largely due to the common distractions a teenager faces, such as social pressures, family strife and immaturity. The defendant's childhood thus was not dissimilar to that of many young people in New York City.

The defendant's life changed dramatically during his early college years, however, when his sister, then seven months pregnant, came down with a sudden illness that ultimately proved fatal, owing to medical complications, to both her and her unborn child. The death of the defendant's sister and her baby caused intense personal and familial strain. (PSR ¶ 5). The defendant responded to this family tragedy in part by committing himself to academic success with the aim of becoming a good provider for his family, as well as returning to certain aspects of his faith, such as care for his parents. He also embraced a more disciplined social life and eschewed acquaintances whom he deemed to be bad influences. (PSR ¶ 6). With this renewed discipline, the defendant attended community college and earned the respect of teachers who recognized his academic ability and promise. With the support of a guidance counselor, the defendant transferred into an Ivy League university, where he enrolled in a number of core classes, as well as a class relating to differing perspectives on Islam. (Id.).

In this more competitive college environment, the defendant faced increased academic and social pressure, but appeared to be doing well until he was unexpectedly confronted with a provocative film, which had been produced by a European filmmaker as a commentary on certain controversial aspects of Islam. (PSR ¶ 7). The film featured a nude woman in a transparent burka with Koranic verses written on her body. While no particular set of events can fully account for the defendant's offense conduct, and the responsibility for his actions falls squarely on his own shoulders, it appears likely that the sudden, tragic death of his sister as well as the defensive position he assumed in a provocative classroom environment both contributed to setting the defendant on a path towards a confused understanding of Islamic extremism. This process was further complicated by the defendant's immersion in a variety of

2

resources relating to Islam that he discovered online, including propaganda materials that had been disseminated by ISIS and other foreign terrorist organizations.

Partly in response to criticisms of Islam, the defendant began to embrace an increasingly conservative view of his religious obligations, for example finding tensions between strict religious observance relating to the payment of interest on debt and the reality of his substantial student loans. (PSR ¶ 8). He also became increasingly sensitive to risqué advertising and public social behavior in New York City. Unfortunately, the defendant abandoned his educational opportunities and began to participate more actively in an online world of religious and cultural debate that included terrorist propaganda. (PSR ¶ 9). He also began to question his ability to reconcile his religious expectations with the environment in which he was living and working. The defendant's curiosity about some of these issues lead him to communicate via social media platforms with individuals and entities that were known to investigators of the New York Joint Terrorism Task Force ("JTTF").

In the summer of 2014, in an effort to caution the defendant that, by actively engaging with possible subjects of terrorism investigations, he was approaching a potentially dangerous path, investigators from the JTTF visited the defendant at his family home in Brooklyn and warned him not to pursue a relationship with ISIS, an emerging but already notorious terrorist organization. (PSR ¶ 9-10). Alarmed by the visit, and fearing the possibility of arrest, the defendant fled the United States and made his way first to Turkey and then, through the use of social media communications, into Syria and ISIS-controlled territory.

The government is aware of no evidence to suggest that the defendant was eager to participate in acts of violence on behalf of ISIS, but rather appears to have been motivated by ISIS's purported aspirations to create an Islamic utopia in Syria, which he believed would comport with his expectations of living under Sharia law. (PSR ¶ 11). The defendant was quickly disillusioned upon arrival, however, when directly confronted with the brutality of the organization and its dubious religious pronouncements, which were not consistent with the defendant's understanding of his faith. For example, he had difficulty reconciling the group's enthusiasm for suicide bombing attacks with his own beliefs about Koranic teachings.

The defendant nevertheless became part of the group. To avoid serving as a front line fighter or suicide bomber, however, the defendant exaggerated his technical capabilities to ISIS in order to obtain primarily administrative responsibilities, suggesting that he could build an electromagnetic pulse generator, a device he had only seen in movies. ISIS embraced his purported technical potential, and also gave him administrative duties in support of the organization's logistical activity. The defendant was present during at least one battle with Kurdish forces, however, and trained with and carried firearms in connection with his duties and responsibilities within ISIS. (PSR ¶ 12). After spending several months serving as an ISIS guard and in an administrative and logistical support role, the defendant was able to earn the trust of his minders and to gain access to a communication device.

3

In October 2014, the defendant surreptitiously sent an electronic message to the FBI identifying himself, referencing his meeting with JTTF investigators in New York, and offering assistance to the United States government in the hopes of safely returning home. Almost immediately following the communication – while it was still being vetted by the government – the defendant made his way across the Syrian border into Turkey, where he made contact with U.S. authorities and was debriefed about his activities in ISIS. After the debriefing, the defendant was quickly flown back to the Eastern District of New York, where he was arrested and presented in a closed courtroom to preserve his ability to work proactively. The defendant immediately began cooperating with U.S. authorities, and since his arrest has supported numerous investigations and other counter-terrorism measures by the United States government ███████████████████████.

On November 26, 2014, the defendant pleaded guilty before United States Magistrate Judge Roanne L. Mann to one count of providing material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, and one count of receipt of military-type training from a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339D. (PSR ¶ 1). In addition to providing assistance to law enforcement and other U.S. government agency authorities, the defendant met with academics, journalists, researchers and subject matter experts from a variety of fields to contribute to the collective understanding of the forces of terrorist "radicalization" and the reality of life in ISIS, which differs dramatically from the images portrayed in much of its propaganda.

Notably, in May 2016, with the government's permission, the defendant also met with a major television news program for a recorded and televised interview in which he discouraged others from following in his footsteps and denounced ISIS as a violent terrorist organization. Moreover, as a participant in the Office's Disruption and Early Engagement Project ("DEEP") the defendant assisted the Office and the Federal Bureau of Investigation in conducting an intervention with a juvenile in New York who had come to the government's attention because of his apparent fixation on ISIS social media. The defendant's ability to empathize with and elicit information from the juvenile was remarkable and was especially valuable to the juvenile's mother and the FBI team assigned to investigate the activity. The defendant's intervention with the juvenile served as a very important step in redirecting the juvenile from embracing ISIS, and has served as a model for potential engagement strategies outside of conventional law enforcement approaches in the area of terrorism prevention.

Following his arrest, the defendant was placed in custody on November 8, 2014 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Moreover, he has continued to meet regularly with the government, DEEP and others to help support terrorism prevention initiatives and to help educate concerned parties about the dangers of terrorist propaganda. ███████████████████████████.

4

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The defendant has had one issue with respect to a test for substance abuse in connection with his presentence interview by the Probation Department, which was disclosed to Pretrial Services and the parties. (PSR ¶ 46). With respect to his education, the defendant recently earned a Bachelor of Business Administration degree in finance, with a 3.571 grade point average.

## II. Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider, inter alia:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider

5

for the purpose of imposing an appropriate sentence." Accordingly, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence in light of the specific facts of the case at hand.

Where, as here, the government makes a motion pursuant to Section 5K1.1, the Court has a basis, in the exercise of its discretion, to depart below the statutory mandatory minimum sentence and advisory Guidelines range. 18 U.S.C. § 3553(e). Section 5K1.1 provides:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.
>
> (a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:
>
> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1 (2016). In addition to the 3553(a) analysis, each of these five factors is discussed below.

### III. Guidelines Calculation

Due to the application of the terrorism enhancement, the defendant's applicable advisory Guidelines range is 360 months to life, based on a total adjusted offense level of 37, and a Criminal History Category of VI. The government has informed the Probation Department of its view on this calculation, and the Probation Department has indicated that is considering whether an addendum is appropriate with respect to the Guidelines range in the PSR. (See PSR ¶¶ 17-28, 62). Section 3A1.4 of the Sentencing Guidelines applies where, as here, "the offense

6

is a felony that involved, or was intended to promote, a federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4 & comment n. 1. Section 2332b(g)(5), in turn, provides that:

> [T]he term "Federal crime of terrorism" means an offense that -
>
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>
> (B) is a violation of . . . 2339B (relating to providing material support to terrorist organizations) or 2339D (relating to receipt of military-type training from a terrorist organization).

18 U.S.C. § 2332b(g)(5). The Second Circuit has held that by requiring that the underlying crime "be calculated to influence or affect . . . or to retaliate against government conduct," the statute does not require "proof of a defendant's particular motive." United States v. Awan, 607 F.3d 306, 317 (2d Cir. 2010). "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." Id. By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." Id. In this case, the both counts of conviction concern the defendant's membership in and support for ISIS, and both charges are violations enumerated in Title 18, United States Code, Section 2332b(g)(5)(b). The defendant's crimes were "calculated to influence or affect" government conduct in that they were undertaken expressly in support of a terrorist organization with a clearly defined history of terrorist activity, and thus the enhancement applies.

Because the counts of conviction carry a combined statutory maximum sentence of twenty-five years' imprisonment, the defendant's effective advisory Guidelines sentence is 300 months' imprisonment. (but see PSR ¶ 61). Pursuant to Title 18, United States Code, Sections 3583 (e) and (j), the Court may impose a term of supervised relief of up to life. (PSR ¶ 65). Absent a 5K motion form the government, the defendant would be facing a mandatory minimum sentence of 10 years. 18 U.S.C. § 2339D.

### IV. Substantial Assistance

The defendant's cooperation is relevant and important to the Court's consideration of an appropriate sentence in this unusual case. During numerous interviews with the government over the course of more than three years, the defendant candidly disclosed his own criminal conduct, as well as his knowledge of criminal activity carried out by members of ISIS. As noted above, to the government's knowledge, the defendant has not minimized his own conduct, nor exaggerated the culpability of his confederates. Moreover, he has provided unique

7

forms of assistance in the government's ongoing counterterrorism efforts. Below, the government addresses each of the 5K1.1 factors.

### A. Significance and Usefulness of the Defendant's Assistance

The defendant's assistance has been extraordinarily significant and highly useful. In the fall of 2014, when the defendant surrendered to U.S. authorities, the government had limited visibility into the activities of ISIS in Syria, and was in the midst of responding to a substantial number of ISIS-directed and inspired threats, both at home and abroad. Because the defendant was cooperating with the government within hours of leaving an ISIS camp in Syria, he was uniquely situated to inform the government of ISIS strategies, tactics, techniques, procedures, personnel and logistical operations. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, by being available to testify as needed, the defendant helped the government establish a means to arrest or otherwise disrupt ISIS members should they be detected outside of Syria. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ While the government has not elected to call the defendant to testify as yet, his availability to testify has been an important factor in bringing additional ISIS-related prosecutions and supporting cases in other districts.

### B. Truthfulness, Completeness, and Reliability of Information

The defendant's information largely has been corroborated and has proven reliable. Given his five months in ISIS-controlled territory, the defendant was asked about a variety of topics in great detail. While his memory was not perfect, nor every detail he provided verifiable, the government is aware of no material inconsistencies or inaccuracies in the information provided by the defendant relating to his knowledge of ISIS. Notably, from his very first contact with U.S. government authorities after leaving ISIS, the defendant has freely volunteered information regarding his own offense conduct and the activities of ISIS and its supporters.

8

### C. Nature and Extent of the Defendant's Assistance

Aside from the valuable law enforcement ▇▇▇▇▇▇▇ information the defendant has provided, he also has voluntarily provided assistance in unique ways outside the scope of his cooperation agreement, in three meaningful ways, none of which was required by the government. First, the defendant voluntarily participated in an interview with a reputable news organization, over which he had no editorial control, in which he denounced ISIS and publicly addressed the false narrative that ISIS was disseminating. It is difficult to fully assess the positive ripple effect of such an endeavor, but it stands as a remarkable example of someone with direct, personal knowledge of the terrorist organization publicly denouncing its agenda and discouraging others from embracing a violent extremist ideology.

Second, the defendant participated in a private intervention with a young man who was being led astray by ISIS propaganda. The defendant was able to reach this young person in ways that government investigators could not, and the defendant's engagement with this person substantially has contributed to a mitigation effort to keep this person from mobilizing towards travel to Syria to join the terrorist organization or to otherwise provide support for ISIS's agenda within the United States.

Third, the defendant has been an active participant in the development of the terrorism prevention program discussed above, DEEP, which is a strategic public/private partnership aimed at reducing the threat of terrorism by building a pool of subject matter experts across disciplines. The project includes prosecutors, investigators and analysts from the JTTF, the Federal Defenders, law firms, the Probation Department, Pretrial Services, mental health professionals, private citizens and others dedicated to reducing the threat of violent extremism. By making himself available to this collaborative network to discuss his experiences, the defendant has provided critical information to public safety professionals and other important partners who have taken up the challenge of terrorism prevention.

### D. Danger to the Defendant Resulting from Assistance

ISIS is among the most dangerous organizations in the world, having claimed responsibility for multiple hideous acts of violence in the United States and elsewhere. Relatedly, members of the public reasonably may be expected to be hostile towards those, like the defendant, who have joined the organization and offered themselves in support of its agenda. The defendant thus faces foreseeable threats from both the terrorist organization he publicly denounced and against which he has cooperated, as well as from members of the community who may feel animosity towards him for leaving New York City to travel to

9

Syria for the purpose of joining the group. Indeed, shortly before sentencing, the defendant was aggressively harassed by a local individual based on the suspicion that he had once supported ISIS. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████ While the government has been and remains committed to taking measures to mitigate potential threats to the defendant, he inevitably will live with an increased level of risk to himself and his family due to his cooperation with the United States, his public statements denouncing ISIS, and any continued involvement in helping to counter the threat of extremist propaganda through early engagement with at-risk individuals. From the moment he began providing information to U.S. authorities about his involvement with ISIS, the defendant has placed himself at risk for retribution.

### E. Timeliness of the Defendant's Assistance

As noted above, the defendant volunteered significant information to U.S. government authorities immediately upon escaping from ISIS-controlled territory – an escape, it bears emphasizing, that the defendant orchestrated on his own, at significant risk to his safety. Moreover, from the first day of his arrival in the Eastern District of New York and for many months afterwards, the defendant provided responsive and substantial information to U.S. government investigators and others who had a time-sensitive need to mitigate the threat of international terrorism posed by ISIS. In sum, his assistance was more than timely, it was instantaneous upon his becoming available.

In light of the above, pursuant to Section 3553(e) the defendant is eligible for a sentence of anywhere between zero and twenty-five years' imprisonment. He already has spent a significant amount of time in custody. Pursuant to Title 18, United States Code, Section 3553(a), in imposing sentence, the Court also must consider, inter alia, the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment for the offense, afford adequate deterrence, and protect the public. The government takes no position as to the specific sentence to be imposed by the Court, but observes that, in the more than three years since the defendant surrendered to U.S. authorities, he has acknowledged the seriousness of his offense. Furthermore, notwithstanding the extremely serious nature of his offense conduct, the government is aware of no information to suggest that the defendant poses a threat to the public.

### V. Request for Limited Sealing

The government recognizes that portions of the defendant's case, including the fact of his cooperation, have become public, and thus has filed a redacted version of this submission on the public document. However, because certain aspects of the defendant's cooperation remain sensitive, the government respectfully requests that the unredacted version of

this letter be filed under seal. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, limited sealing is appropriate under the circumstances. See, e.g., United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995) (danger to person may be compelling reason to override public's qualified right of access). Moreover, unsealing this letter in its entirety, and thus publicly confirming all of the details and extent of the defendant's cooperation, will likely harm the ability of law enforcement to secure current and future cooperation from persons similarly situated to the defendant, a fact that also weighs against public disclosure. United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995). Under these circumstances, the parties' countervailing interests in the defendant's safety and potential use in ongoing cooperation outweigh the public's qualified right to access. As the facts set forth above provide ample support for the "specific, on the record findings" necessary to support sealing, Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006), the government respectfully requests that the Court record those findings and file this letter under seal.

## Conclusion

Based on the foregoing information, the government moves pursuant to § 5K1.1 of the Guidelines and 18 U.S.C. § 3553(e), to permit the Court, in its discretion, to impose a sentence below the applicable statutory mandatory minimum and the advisory Guidelines range. The government takes no position on the specific sentence to be imposed. With respect to the potential for supervised release, which may be imposed for up to life by statute, the government respectfully requests that the defendant be permitted to continue to assist the government with respect to ongoing cooperation, including contact with the subjects and targets of terrorism investigations, if under the supervision of law enforcement authorities. Because of the nature of the information provided in this letter, the government respectfully requests that portions of it be filed under seal for a reasonable period of time until further order of the Court. The government is filing a redacted version of this letter on the public docket contemporaneously with the sealed version of the submission.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/
        Seth D. DuCharme
        Samuel P. Nitze
        Assistant U.S. Attorneys
        (718) 254-7000

Cc: Gary Villanueava, Esq.
     Jaime Turton, U.S. Probation