UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

– against –

JOHN DOE,

Defendant.

---

14-CR-00612-001
**\*NOT SEALED\* Statement of
Reasons for Sentence Pursuant to
18 U.S.C. § 3553(c)(2)**

**Jack B. Weinstein, Senior United States District Judge:**

**Appearances**

**For United States:**

Seth D. DuCharme, Esq.
United States Attorney's Office, EDNY
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6465

**For Defendant:**

Gary S. Villanueva, Esq.
11 Park Place, Suite 1601
New York, NY 10007
212-219-0100

**Table of Contents**

I.   Introduction ............................................................................................................... 2

II.  Facts......................................................................................................................... 4

  A.  Defendant's Childhood and Upbringing ......................................................... 5

  B.  College Experience and Path towards ISIS ..................................................... 5

  C.  Time in Syria and ISIS ................................................................................... 7

  D.  Escape from Syria and Arrest......................................................................... 9

  E.  Guilty Plea .................................................................................................. 10

  F.  Cooperation with Government/5K.1 Letter.................................................. 10

  G.  Life since Returning to the United States..................................................... 12

H.  Sentencing ......................................................................................... 14

I.  Experts ............................................................................................... 16

   i. Risk of Recidivism ...................................................................... 17

      a. Seamus Hughes ..................................................................... 17

      b. Moustafa Ayad ...................................................................... 20

   ii. Conditions of Supervised Release .............................................. 22

III.  Sentencing Guidelines and Statutory Sentencing Requirements ..................... 24

   A.  Guideline Calculation ..................................................................... 24

   B.  Statutory Sentence ......................................................................... 25

   C.  5K1.1 Letter ................................................................................. 25

IV.  Law ........................................................................................................ 26

   A.  Minimum Guideline and Statutory Minimum ................................. 26

   B.  Sentencing for Similar Crimes in the United States ......................... 27

   C.  Other Nations' Approach to ex-ISIS Adherents ............................... 31

V.  18 U.S.C. § 3553(a) Considerations .......................................................... 35

   A.  Nature of the Offense and Characteristics of the Defendant ............ 35

   B.  Deterrence ..................................................................................... 37

   C.  Risk of Recidivism ......................................................................... 38

   D.  Rehabilitation ................................................................................ 40

VI.  Sentence ................................................................................................ 41

VII.  Conclusion .............................................................................................. 43

I.    Introduction

Terrorism in support of ideology is not unknown in American history.  *See*, *e.g.*, David S. Reynolds, *John Brown, Abolitionist* 11 (Alfred A. Knopf 2005) ("Whitman sought to provide America with healing and reconciliation through poetic language . . . Brown . . . resorted to terrorist tactics to disrupt the South's peculiar institution.").  Nor is the history of export of American volunteer fighters to foreign wars unusual: we need only recall American individuals' aid to civil wars in Greece, Israel, Italy, Spain, Sri Lanka, the Soviets, and Nazi Germany.

The general cruelty of the Islamic State of Iraq and Syria ("ISIS") is as particularly shocking and dangerous as any throughout history; it is denounced by humanity and anathema to the United States.

The question before the court is how can the sentencing of an American citizen, who traveled to Syria to fight for ISIS, and then returned to the United States four months later, be sensitive to the unique nature of the defendant's story, the need to protect the public from any further crimes of the defendant, and the required general deterrence of others who might help ISIS here or abroad.

On June 12, 2014, John Doe ("Doe" or "defendant"), a 29-year-old naturalized American citizen—whose name is withheld so that he can assist American authorities while minimizing risks to self and family—boarded a flight from John F. Kennedy International Airport ("JFK") to Turkey. Eventually he made his way into ISIS controlled territory in Syria. Between June and November 2014, he served ISIS in an administrative role. But, he was present in at least one battle, he received military training, he carried firearms, and he was introduced to explosive belts used to blow up civilians.

Despite his expectations of an Islamic utopia, the reality that he encountered was not like what he envisaged. Doe was unprepared for the unrestrained brutality of ISIS. He felt betrayed by the group's false representations of his Muslim faith. In October 2014, while in Syria, defendant sent an email message to the Federal Bureau of Investigation ("FBI") identifying himself and offering assistance to the United States government. He sought FBI help in returning home to New York.

Doe escaped from ISIS. He found his way to Turkey and into United States custody.

Defendant then began four years of full cooperation with United States law enforcement. At a time when the inner workings of ISIS were not well understood in the United States, he provided valuable detailed information on ISIS's activities. He also helped deter others from joining ISIS and similar terrorist groups.

Doe was charged with providing material support to a foreign terrorist organization, 18 U.S.C. § 2339B, and receiving military-type training from a foreign terrorist organization, 18 U.S.C. § 2339D. He pled guilty on November 26, 2014. And he was sentenced on June 28, 2018.

Defendant's good personal history and the dangerous nature of his conduct present the court with a variety of sentencing issues: (1) the need to address the seriousness of his terrorism-related crimes, punishing and specifically deterring him, and generally deterring others; (2) the historical and contemporary context of citizens who travel abroad to aid foreign enemies of this and other countries; and (3) the legal requirements that a court evaluate defendant's individual circumstances, risk of recidivism, potential for rehabilitation, and culpability when crafting a sentence.

Above all, the court must consider how best to protect the public.

It should avoid needlessly destroying a defendant, but do what it can to encourage him to live a life within the law. *Cf. United States v. C.R.*, 792 F. Supp. 2d 343, 511 (E.D.N.Y. 2011), vacated and remanded sub nom. *United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013) ("Excessive and unnecessary imposition of suffering and destruction of opportunity for a constructive life as a youngster constitutes cruel and unusual punishment.") (citing David Gray, *Punishment as Suffering,* 63 Vand. L.Rev. 1619, 1692–93 (2010)).

II.     Facts

4

## A.  Defendant's Childhood and Upbringing

Defendant was born in Bangladesh in 1989.  Pre-Sentence Report ("PSR") ¶ 36.  He and his parents legally immigrated to the United States when he was one year old.  *Id.* at ¶ 41.  As naturalized American citizens, he and his family set their roots in Brooklyn, where he spent his childhood, adolescence, and early adulthood, as part of a middle-class family.  *Id*.  His father is a retired electrician; his mother remained inside the home.  *Id.* at ¶ 36.

By all accounts, defendant had a normal childhood: he engaged in sports, attended public school, and practiced the Muslim faith of his parents, attending religious classes.  *Id.* at ¶ 4.  In high school, and initially in college, he underperformed academically because of common teenage distractions: social pressures, family strife, and immaturity.  *Id.* at ¶¶ 5, 50.

He was particularly affected by the sudden illness of his sister, at the time seven months pregnant, culminating in the death of her and the unborn child.  *Id.* at ¶ 5.  His deceased sister, a successful civil engineer, had been a devoted Muslim who wore a burqa.  Hr'g Tr. 10:19–11:18, June 28, 2018.

Defendant has three surviving siblings, two older and one younger.  PSR at ¶ 37.  His older brother is married with children and works as a salesman.  *Id*.  His older sister works as an interior designer and his younger brother is a college student.  *Id.*  They all reside in New York City.  *Id.*

## B.  College Experience and Path towards ISIS

Doe's response to his sister's death altered the course of his life.  He committed himself to academic success with the aim of becoming a good provider for his family; he also devoted himself to his religious faith, embracing a more disciplined social and religious life.  *Id.* at ¶ 6.

He attended community college, earned the respect of his teachers for his academic ability and potential, and transferred to a four-year college.  *Id.* at ¶¶ 6, 48.

Doe faced increased pressure from a variety of academic and social sources, at a particularly vulnerable and impressionable time in his life.  *Id.* at ¶ 7.  As is typical with many college students, he smoked marijuana and drank alcohol socially.  *Id.* at ¶ 45.

He was confronted with representations of his Islamic faith that did not comport with his vision of his own religious identity.  One particularly resonant moment for defendant was being unexpectedly confronted with a provocative film called "Submission," as part of a class covering different perspectives on Islam.  *Id.* at ¶ 7.  The film had been produced by a European filmmaker as a commentary on certain controversial aspects of Islam and featured a nude woman in a transparent burqa with Koranic verses written on her body.  PSR at ¶ 6.

The defendant explained at sentencing:

> I've always thought [the burqa] was a nice thing . . . I've always saw my sister as like a really strong character in terms of how she wore the burqa herself. She was very successful. She was our oldest sibling and she gave a lot of pride to my father and our family and she decided to wear the burqa one day and even though she got a really good job in a really big firm and she was very successful and she was wearing a burqa at the time. It was amazing to see someone who is so successful at the same time also very I guess you might say conservative on some other sides. . . It was heartbreaking to see someone think of this thing that's was so beautiful that my mom wore and my sister wore and that other family members growing up in the tri-state area I have seen and Muslims of this character and good nature like this. I just feel it was heartbreaking to see that. That's generally why it hurts.

Hr'g Tr. 10:25–11:18, June 28, 2018.

In response to the film and to other perceived criticisms of Islam, Doe began to embrace an increasingly right-wing view of his religious obligations.  PSR at ¶ 8.  He abandoned his education and increasingly participated in an online world filled with religious debate and ISIS propaganda.  *Id.* at ¶ 9.  Faced with a growing sense that his religious beliefs were irreconcilable

6

with the environment in which he was living, he began to communicate directly with religiously radical individuals and groups through social media. *Id.*

Defendant's online activity caught the eye of investigators from the FBI's Joint Terrorism Task Force ("JFFT"). *Id.* at ¶ 10. Investigators visited defendant at his family home in Brooklyn and warned him not to pursue a relationship with ISIS. *Id.* During the interview, he admitted that he was interested in events in Syria and generally supported "rebel groups" who were fighting against the Syrian government; he stated, however, that he lacked the resources to travel to Syria and indicated that he would not know what to do if he were to travel there. *Id.*

Alarmed by the investigator's visit and fearing the possibility of arrest, he boarded a flight a few days later, flying from JFK to Turkey. *Id.* He then made his way into Syria and ISIS controlled territory using social media connections. *Id.*

C. Time in Syria and ISIS

It does not appear that Doe's trip to Syria to join ISIS was motivated by a desire to commit acts of violence. *Id.* at ¶ 11. Instead, given his increasing disassociation with American culture, he seems to have been motivated by ISIS's purported aspirations to create an Islamic utopia. *Id.*

> [M]y . . . goal at the time was seeking out a place I could live [where] basically Islamic law or Islamic morals were easy to follow. I guess the most basic way I can explain it was I wanted an environment where I can -- being or living towards halal, as you know halal and haram means something that's permissible and not permissible. . . . H]aphazardly . . . I bought the ticket to go and I didn't have much planning. All I knew on the news was there was a town north of Raqqa where the borders cross. That's all I knew in terms of a plan to go there. . . From there I made personal contact on how to get to Raqqa. . . . I don't know how to say it, literally stupid what I am doing, it seems I'm scared and I want to live in what I thought would be an ideal society.

Hr'g Tr. 12:1–13:21, June 28, 2018.

Even before stepping foot in one of its camps, defendant experienced regret about his decision to join ISIS.

> Right before going across the border . . . I was beat up by border patrol. I've never been in a real fight ever . . . I remember ending up on my back on the ground and I felt oddly enough some kind of relief. Okay, now I'm going to go back home. I'm in way over my head. But then we were forced to go past the border and I ended up across the border and then we ended getting picked up by ISIS people, . . . I ended up in this town, in this small little place, this holding facility where they kept all these younger guys . . . my glasses had broken at some point and I saw somebody who had a similar like power [glasses]. I asked if I could borrow [them] to get a good look of what's going on and I went to like a higher elevation to see where I am and get[] an idea. I put on the glasses and I remembered feeling complete hopelessness. I saw desert, endless desert, empty desert. . . . I just felt where am I, what am I doing.

*Id.* at 14:8–15:2.

The real ISIS was quite different from the utopian Islamic environment that Doe had contemplated.  He was confronted with the brutality of ISIS and its dubious religious pronouncements, which were inconsistent with his own Muslim faith.  PSR at ¶ 11.  He struggled to reconcile ISIS's enthusiasm for suicide bombing attacks with his own beliefs about peaceable Koranic teachings.  *Id.* at ¶ 11.  ISIS clerics acknowledged that suicide bombing was not sanctioned by the Koran, but, nevertheless, supported it.  Hr'g Tr. 15:13–23, June 28, 2018.  He was pressured into denouncing his parents as heretics.  *Id*. at 15:6–13.  He recalled the horror he felt the first time he saw a suicide belt, slowly backing away in fear as the other ISIS members gravitated towards it.  *Id.* at 16:2–7.

Defendant concluded: "It was . . .  senseless.  These people [,ISIS members,] are liars. These people are not Muslim. That's not how Islam is or the Koran."  *Id*. at 15:22–25.

He exaggerated his technical capabilities to obtain administrative duties and avoid serving as a front line fighter or suicide bomber.  PSR at ¶ 12.  He was present for one battle with Kurdish forces.  *Id.* at ¶ 12.  He received military training and carried firearms.  *Id*.  Typically,

8

defendant provided administrative, logistic, or support services, or served as a guard at an ISIS organizational headquarters. *Id.*

  D.  Escape from Syria and Arrest

After several months in an ISIS camp, Doe escaped.  He was able to gain access to an electronic communications device.  Ltr. from Prob. Dep't at 2 (Dec. 11, 2017) ("Prob. Ltr.").  In October 2014, in hopes of returning home to New York, he sent an email message to the FBI identifying himself, referencing his meeting with JFFT investigators in New York, and offering assistance to the United States government.  *Id.*  The email stated:

> I'm an American who's trying to get back home from Syria. The FBI has a file on me and I can verify who I am with random information you ask me. . . . I've coordinated a way to get to the border ... in Turkey and near ... Syria ... by use of civilian smugglers. My problem is that I need a pickup from trusted sources because I'm without passport. It was taken, and they won't give it back. . . . If someone can pick me up safely from across the border before [Kurdish forces] get to me, then I'll be 100% in the right hands. . . . Please help. I had a week [sic] thought out letter, but it's too risky to have it saved on my device. I'll try to write to you soon in full explanation. But right now my window is closing. I have information on IS movements, locations, heads, systems, and some specific files . . . . If you guys can get me I will give as much information as I possibly can. From my time here, I've learned a lot, and I just want to get back home. All I want is this extraction, complete exoneration thereafter, and have everything back to normal with me and my family. . . . Please help me get home. . . . I have gathered a lot of info I really want to give. I'm fed up with this evil.

Compl., ECF No. 1 (Nov. 3, 2014).  Before leaving ISIS territory, he collected some ISIS papers to enhance his value to the FBI.  *See* Hr'g Tr. 43:1–6, June 27, 2018.

Shortly after this communication, defendant made his escape.  Prob. Ltr. at 2.  He negotiated his way across the Syrian border into Turkey, where he contacted United States authorities and was debriefed about his ISIS activities.  *Id.*  Immediately, he provided government officials with intelligence information, which included sensitive documents garnered

during his escape.  Hr'g Tr. 43:1–6, June 27, 2018.  Following debriefing, he was flown back to

the Eastern District of New York where he was arrested.  Prob. Ltr. at 2.

Doe explained that his decision to defect from ISIS was motivated in part by the wanton

cruelty he witnessed living and working in the terrorist group:

> "My first realization is how do I get home? How do I get home? How do I get to
> the border? . . . [H]ow do I get away from these people?  . . . I grew up here [in
> America]. I grew up with good people and when I saw over there . . .  What I saw
> is how they were. . . . [T]hey were evil people. That's what made me hate them. I
> wanted good but I saw nothing but evil."

Hr'g Tr. 16:8–17:4, June 28, 2018.

E.  Guilty Plea

On November 26, 2014, Doe, pursuant to a cooperation agreement with the government,

pled guilty to one count of providing material support to a foreign terrorist organization, in

violation of 18 U.S.C. § 2339B, and one count of receiving military-type training from a foreign

terrorist organization, in violation of 18 U.S.C. § 2339D.  PSR at ¶ 1.

F.  Cooperation with Government/5K.1  Letter

Over the course of the almost four years since his arrest, defendant has provided

"extraordinarily significant and highly useful" assistance to the United States government's

ongoing counterterrorism efforts.  Ltr. from United States Attorney, ECF No. 47 (June 8, 2018)

("5K1.1 Ltr.") at 8.  Defendant's assistance "materially contributed to the national security of the

United States and its allies."  *Id.* at 2.

Doe began cooperating with United States authorities immediately upon his arrest.  Prob.

Ltr. at 3.  He has assisted in several investigations and counter-terrorism measures by the United

States government and its allies around the globe.  *Id.*  The government deems his cooperation

truthful, complete, and reliable.  5K1.1 Ltr. at 8.

Defendant's information came at a critical moment in America's struggle against violent extremism when the inner workings of ISIS were largely unknown and the threat from the group seemed to be intensifying. *Id.* at 7. The government explained:

> In the fall of 2014, the government had limited visibility into the activities of ISIS and Syria, and was in the midst of responding to a substantial number of ISIS-direct and inspired threats, both at home and abroad. Because the defendant was cooperating with the government within hours of leaving an ISIS camp in Syria, he was uniquely situated to inform the government of ISIS strategies, tactics, techniques, procedures, personnel and logistical operations. Moreover, because ISIS was under the impression that the defendant was merely visiting a neighboring country and was planning to return to Syria, he was able to assist the government in communicating with multiple members of ISIS covertly, in real time, to gain additional valuable information about their activities, which was shared with multiple U.S. government agencies.

*Id.*

Doe has voluntarily provided assistance to United States counterterrorism efforts in a variety of ways outside the scope of his cooperation agreement. He appeared on a major television network for a recorded and televised interview in which he discouraged others from following in his footsteps and denounced ISIS as a violent terrorist organization. Prob. Ltr. at 3. He met with academics, journalists, researchers, and subject matter experts from a variety of fields to contribute to the collective understanding of the forces of terrorist radicalization and the reality of life in an ISIS training camp. *Id.*

The Eastern District's United States Attorney's Office Disruption and Early Engagement Program ("DEEP"), a terrorism prevention program aimed at reducing the threat of terrorism by building a pool of subject matter experts across disciplines, has obtained useful information from his involvement. *Id.*

As part of DEEP, Doe participated in the instruction of a juvenile in New York who was on a path towards jihadism. *Id.* Doe's engagement—in particular his ability to empathize with

11

and elicit information from the juvenile—reduced the risk of the young man joining ISIS; it has served as a model for potential engagement strategies outside of conventional law enforcement approaches to terrorism prevention. *Id.*

Since the defendant's release on bail, he has continued to meet regularly with DEEP and others to support terrorism prevention activities and to educate the public about the dangers of ISIS propaganda. *Id.* He has also conferred with foreign authorities and expressed a willingness to continue to work with and support the United States and its allies in their counterterrorism efforts. *Id.*

Doe's cooperation with the government and his public statements denouncing ISIS have come at serious risk to his and his family's safety. 5K1.1 Ltr. at 9–10. He faces foreseeable threats from ISIS, as well as from members of his own community who are hostile towards him for his prior association with the terrorist group. *Id.*

### G.  Life since Returning to the United States

Following his arrest in November 2014, defendant was incarcerated for over 21 months. He was released on bail on August 19, 2016 and since has been under the close supervision of Pretrial Services awaiting sentencing.

Doe is currently living with his parents in Staten Island. Hr'g Tr. 60:1–4, June 27, 2018. He recently graduated from a New York City College with a Bachelor of Business Administration degree in finance and a 3.57 GPA. 5K1.1 Ltr. at 5. A neighbor hired him as an electrician, the trade he learned from his father. Hr'g Tr. 59:12–18, June 27, 2018.

He is pursuing a career in business, but is having trouble finding employment because of the nature of his crimes. *Id.* at 59:3–12. The defendant continues to have the support of his parents and siblings. PSR at ¶¶ 36, 37.

At sentencing, the defendant was questioned about his life:

COURT:  I would like to ask the defendant some questions to determine, if I can, the extent to which he has transmuted his position into one in lawful society.  When did you get your degree?

DEFENDANT:  Almost a month now. . . .

COURT:  What were your [most recent] grades? . . .

DEFENDANT:  I took six classes and there was four A's, an A minus and a B plus I believe. B plus, yes.

COURT: Are you working? . . .

DEFENDANT: I'm working to find a job relating to my major, which is very difficult considering.

COURT:  What is your major?

DEFENDANT:  Finance.

COURT:  You're in the financial center of the world; why can't you get a job?

DEFENDANT:  I can be easily Googled, any curiosity as to who I am, I'm a Google away from sort of a dangerous position, or a precarious position. So that gives me hesitancy in how I approach finding employment. Currently I'm just depending on my father's trade I learned growing up.

COURT:  What is your father's trade?

DEFENDANT:  Electrician. I grew up helping him in the summers. So I know that easily, just residential things. So I depend on that currently until I find better employment. . . .

COURT:  Are you working now for him?

DEFENDANT:  Right now I'm working with my neighbor who is an electrician. I'm useful to him I guess. Yes.

COURT:  Where do you live?

DEFENDANT:  Staten Island.

COURT:  With your parents?

13

DEFENDANT:  With my father and mom.

COURT:  Do you have any relationships with others? . . .

DEFENDANT:  Your Honor, my friends are getting like married and having kids and I'm – I feel bad like I'm getting old and I've always -- I've always wanted to have kids, a lot of kids. I have nieces and nephews. I want to get to that point where I can get married and have kids, after that retirement, if it's not too early, and give up and just be happy with what I have. Really that's what I am striving for I guess, supporting my family and supporting a potential future family. . . .

COURT:  Are there any other indicia you can point to indicating . . . to me, and to some extent the authorities and the public, that you are going to lead a lawful life?

DEFENDANT:  If you mean in terms of personal relationships. Generally, I've been keeping a low profile just for the safety of myself and my family. Developing personal relationships with acquaintances and mutual friends has been generally a slow thing and I crave that, yes. But in terms of my relationships, as far as strong relationships, I would say I have a strong purpose, a shared purpose with the agents that were assigned to me and . . . and . . . about really producing something and I really enjoy my being proactive and finding something useful and thinking in terms of what is a way to stop this problem. Given that business sense that I had it's like problem solving and this is a really interesting problem at least from my perspective and findings solutions for it I feel I have strong expertise on terrorist groups and radicalization, if you want to use that word, in terms of my specific knowledge going down to understanding ISIS and their behavior. I think I present a huge boon for society in that regard. If I found someone who is that knowledgeable, to step out of my shoes and just see someone who understands as much as I believe I do, I would think this person is really valuable and important to helping government . . .

COURT:  Do you want to add anything to what you have said or what others have said that may be useful to me in deciding whether you remain a threat to society?

DEFENDANT:  I said the best I could, like I've been through a lot, a lot. It's hard to say. You have no idea. With respect, your Honor, you have seen more than I have. I have seen a lot and I have been through a lot of pain and at my age right now I'm considering what I call it is retirement, like I'm just going to relax have kids and just live my life out like that. I'm not letting religion being any sort of driving factor for me. *My motivation in life is just family and being the best person I can be, seeing the best in others and doing the best I can.*

Hr'g Tr. 58:9–62:23, June 27, 2018 (emphasis added).

H.  Sentencing

The sentencing hearing was held on June 27 and June 28, 2018.  Defendant's father and sister were present.  The proceeding was videotaped.  *See In Re Sentencing*, 219 F.R.D. 262, 264-65 (E.D.N.Y. 2004) ("The sentencing hearing normally requires that the defendant be observed for credibility, mental astuteness, physical characteristics, ability to withstand the rigors and dangers of incarceration, and a myriad other relevant factors. . . . A judge applies mental impressions of many tangible and intangible factors when imposing a sentence.").

Doe's sister testified about the changes she witnessed in her brother since his return from Syria:

> Q  Tell the court in what ways he changed when he came back?
>
> A  When he came back -- before he left, we were not on speaking terms. But when he came back he was very sorry. He was very apologetic. He expressed his remorse and he expressed how foolish he was in him leaving and putting our family through what he did.
>
> Q  In addition to being sorry, how about his behavior to you, has it changed?
>
> A  He was completely changed, yes.
>
> Q  Is he back to normal?
>
> A  Yes, he is.
>
> Q  What was normal?
>
> A  Confiding in me, telling me what he wants to do with his life, how he wants to be with his family.
>
> Q  Has he refocused his goals?
>
> A  Yes. He's back in university. He's graduated. He talks with our family about having a masters in business one day, owning a home, owning a car, being able to succeed in our society.
>
> Q  Have you talked about him having his own family?
>
> A  Yes.

Q  Has he expressed a desire to have purpose in life?

A  Yes.

Q  Can you share that with the court?

A  In that time I've been married and he has expressed himself wanting to settle down and having a family and being able to be back in our society and succeed. . .

Q  Do you have any doubts in your mind of whether or not your brother would go back to extremism in any way?

A  No, I don't.

Q  Any doubts?

A  No, no doubts.

Hr'g Tr. 35:7–36:18, June 27, 2018.

Defendant testified at length at sentencing.  He expressed remorse for his actions and a renewed peaceable commitment to the United States.

I was wrong. I was foolish. I was an idiot. I made the greatest mistake of my life. I mistook false tenants of religion to be a sort of guiding light in my confusion of seeing a video that was deeply disturbing. . . . I'm deeply sorry for all that's happened. The pain and anguish to my family. My mom and my dad, my brothers and sisters, I'm sorry for the embarrassment I've caused to my community. . . .

Growing up here from the age of one, I had known the freedoms of choice, aspiration, belief, and dreaming for greater future for oneself. . . . I was lucky to have grown up here, learn here, and really live here. . . . Today having graduated now and making friends and seeing every day Americans -- the same ones I've always known and new ones -- I'm immeasurably happy. I am surrounded by wholesomeness, people with immense goodness, and a rampant aspiration for goodness and greatness for one another, for ourselves, and for our community and our people and our country.

Hr'g Tr. 48:25–51:11, June 27, 2018.

I.  Experts

Two experts on Islamic extremism, Seamus Hughes and Moustafa Ayad, testified about defendant's reduced risk of recidivism and the special conditions needed to supervised release that would be useful in preventing Doe from reoffending.

i.   Risk of Recidivism

a.   Seamus Hughes

Seamus Hughes is the Deputy Director of George Washington University's Program on Extremism; he was formerly an intelligence policy officer for the National Counterterrorism Center and the Senior Counterterrorism Advisor to the United States Senate Homeland Security and Governmental Affairs Committee.  Expert Report of Seamus Hughes at 1 (June 26, 2018) ("Hughes Report").

He is a qualified expert on terrorism, homegrown violent extremism, and strategies for countering violent extremism.  *See* Hr'g Tr. 5:12–7:4, June 27, 2018.  Mr. Hughes met with the defendant for four hours in 2017 and reviewed relevant public sentencing filings prior to the submission of his report.  Hughes Report at 1.  His testimony regarding his evaluation of the defendant's risk of recidivism, as well as his recommendations for conditions of supervised release, corroborated his report.  *See* Hr'g Tr. 5–14, June 27, 2018.

Hughes described the factors that he considers relevant when making a prediction about a former violent extremist's likelihood of returning to jihadism:

> There's a couple of factors you should look at. One is the motivation of why this individual joined the terrorist group to begin with. Was it violence, a utopian idea, wanting to build something like that. The manner of how they left the terrorist organization. Did they leave voluntarily? Did they cooperate with law enforcement? Are we willing to be subjected to these individualized programs? All of that will give you a sense of whether this individual may be susceptible to deradicalization or disengagement programs.

*Id.* at 10:2–10.

17

He elaborated on several factors he found significant in Doe's history with respect to his

risk for reoffending:

> Q  Are there facts specific to this case that in your opinion are relevant to efforts to
> mitigate risk or that could be indicators of aggravating or mitigating circumstances?
>
> A  In this case I looked at a number of factors. One is the defendant voluntarily left
> the terrorist organization. He turned himself in to law enforcement. He has been
> cooperating for the last four years with law enforcement and then going further than
> that he's also been engaging and working on in at least one case an intervention of
> a young man or a woman who was thinking about going down the same path he
> did.
>
> Q  In your opinion what's the relevance of those factors?
>
> A  I'm not a threat assessment professional. I would say putting those factors
> together gives you a sense of whether this individual was moved on from his past
> beliefs. So the past in many ways can hopefully guide the future.
>
> Q  Do you have any opinion as to whether or not there's any period of time, duration
> of time, that's necessary to responsively assess whether or not an individual is still
> sort of mobilizing or moving towards a dangerous criminal path?
>
> A  I do not know. Each person is going to be different.

*Id.* at 11:3–23.

This expert opined on the importance of several factors in predicting recidivism:

> Q  You indicated that there were indicators or factors that were relevant to making
> a prediction of whether a person would turn back to radicalization?
>
> A  Yes.
>
> Q  You indicated that one of the factors was how a person left the terrorist
> organization?
>
> A  Yes.
>
> Q  In this particular case, with this particular John Doe, what were your findings
> with respect to whether or not he left?
>
> A  This individual did leave voluntarily.
>
> Q  And how do you rate that factor?

18

A  High in terms of his wanting to leave that past life.

Q  With respect to turning himself in, John Doe in this case turned himself in to the authorities?

A  John Doe did turn himself in to the authorities and cooperated with law enforcement.

Q  How do you rate those factors?

A  They are important factors as we weigh recidivism.

Q  You indicated that he worked to intervene at least with respect to one juvenile, is that correct?

A  Correct.

Q  Do you rate the fact -- how do you rate the fact that he interacts with journalists, researchers, academics, to give information and give those folks the benefit of his experience? How does that factor weigh?

A  As an outside researcher it's very important to get that information. You have to think at the time the defendant left it was 2014. The understanding of the internal workings of ISIS was not fully understood and at least from my perspective having that knowledge of both the intake process of taking foreign recruits and also how life in ISIS was. That went a long way explaining the importance of the terrorist group.

Q  Is that also an indicator for you as to whether or not he's likely or less likely to go back to a terrorism organization?

A  I think it's an important factor to weigh.

*Id.* at 12:12–13:24.

When questioned about whether defendant still may hold radical beliefs, Mr.

Hughes stated:

I had a very short window, approximately four hours with him. Ideally I would want to have longer with the defendant. I did find him to be both forthright in his beliefs and also willing to talk about these things in a way that seemed to express regret.

*Id.* at 14:5–9.

b.   Moustafa Ayad

Moustafa Ayad is the Head of International Communications Programmes for the

Institute for Strategic Dialogues, a global counter-extremism non-profit organization.  *Id.* at

15:3-15.  He manages the Against Violent Extremism Network, a group of former extremists and

survivors of extremist events that conducts interventions, public speaking engagements and a

range of programming to stem the tide of violence, polarization, and extremism globally.  *Id.* at

17:8–20.  He testified as a qualified expert in Islamic extremism and strategies to counter violent

extremism.  *See id.* at 15:3–19:19.

This expert reviewed various public sentencing filings in this case prior to his testimony.

*Id.* at 19:25–20:6.  He did not submit a report, but he did review the Hughes Report and stated

that he did not disagree with any of Hughes's conclusions.  *Id.* at 38:24–39:1.

Ayad testified generally about the factors that would help him predict whether an

individual is likely to return to violent extremism:

> Q Starting with more generally, based on your experience, Mr. Ayad, have you
> identified any factors that are either aggravating or mitigating that you would
> consider aggravating or mitigating in trying to make a prediction as to whether or
> not an individual may be likely or unlikely to return to a path towards a violent
> extremist ideology?
>
> A So in regards to that question I think there isn't, A, there is not enough data, first
> of all, in regards to this sort of population in order to have a definitive answer.
> However, there are certain factors that need to be I guess in place and that includes
> psychosocial services being provided to the individual on a continual basis as well
> as community driven sort of approaches that focus on healing trauma that the
> individual has either caused or he has or she has been through. Similarly providing
> that person with an avenue in order to have a positive outlet, give back to the
> community and a network of outside of government services and out of the
> government agencies that provide positive mentorship throughout that process.
>
> Q And on --
>
> A But every individual case again is different. . . .

20

Q If you were looking at facts leading up to an individual let's say deciding to travel to join a group, are there relevant – are there any factors that you would consider to be relevant factors in trying to assess motivation in that time frame?

A So there are a number of sort of internal and external push and pull factors that can compel an individual to I guess join an extremist organization. In terms of the individual, and they vary between every person, push factors include grievances such as issues around status in regards to feeling of persecution, perceived grievances in regards to socioeconomic status sometimes are involved. Similarly mental health on some levels as well as the need for a purpose sort of driven life significance. Sometimes it's been called the quest for significance I believe as well as a sense of community and identity. A lot of individuals are sort of dealing with identity issues. These are push factors and extremist groups are able to manipulate those issues and exploit them through narratives that speak specifically to those issues and frame them within a religious framework to make them seem bigger and more important than it is.

Q In circumstances where an individual leaves a group, an extremist group, are there any particular factors that you consider relevant to be assessing motivation or predictors in the circumstances under which an individual leaves the group, for example, whether it's voluntary or nonvoluntary?

A Yes. I think there's different sort of factors there. Again, it's based on the individual case. There are a number of sort of studies that have looked at, autobiographical accounts of extremists and their disengagement points. Things like dissolution with leadership, dissolution with group objectives, violence, not being able to actually deal with violence as a solution. Things of that nature that lead people to disengage . . .

*Id.* at 20:9–22:17.

He opined that he was not in a position to make an individualized assessment of

defendant's risk of recidivism because he had not met defendant prior to the sentencing hearing.

*Id.* at 26:8–10.  In an exchange with the court, Mr. Ayad stated that defendant does not appear to

be a "threat to wider society," pointing to his voluntary disengagement, his willingness to

publicly counter the group's ideology in the media, and his cooperation with authorities.  *Id.* at

26:12–20, 28:17–23.  He added, however, that defendant's "voluntary [] pathway into

radicalization" was an aggravating factor with respect to his likelihood for reoffending.  *Id.* at 23:13–20.

ii.    Conditions of Supervised Release

Expert Hughes recommended several approaches that could help mitigate defendant's risk of recidivism:  (1) requiring counseling and mentoring support to the defendant; (2) limiting and monitoring defendant's online activities; (3) restricting defendant's interaction with known or suspected terrorists unless sanctioned by law enforcement; and (4) implementing various "tripwires," such as online monitoring and systematic check-ins/threat assessments in the supervised release process that would alert law enforcement to Doe's possible regression into radical beliefs.   Hughes Report at 2.

Both experts recommended an "individualized approach," creating a "cocoon" around the defendant comprised of community groups, law enforcement, religious leaders, and others.  *See*, *e.g.*, Hr'g Tr. 9:5–15, 24:5–20, June 27, 2018.  In a joint exchange with the court, the experts recommended setting up an alert system where law enforcement is notified immediately if defendant shows any sign of a regression into extremist behavior.

> MR. HUGHES: Your Honor may want to consider some level of trip wires in the system and whether that may be on line monitoring of his internet accounts given his past usage of that to engage with individuals, mandatory counseling of some sort. You are going to want to set up -- if the judge's wisdom is to eventual release which I think it is, we should figure out a cocoon system so that one he gets the service he needs' but also law enforcement gets alerted if there's any kind of regression back into violence.
>
> COURT: Yes.
>
> MR. AYAD: Because I thought maybe this was a conversation, in regards to just building on what Mr. Hughes said, developing an almost like a referral board system is vital.
>
> COURT: What is the term you used?

MR. AYAD: Like a referral board that would work hand in hand with services and with authorities in regards to developing milestones, looking at incidents with the individual as they progress, if the decision is to have some sort of supervised release.

*Id.* at 27:1-20.

The court questioned the experts on whether further incarceration would be useful in defendant's rehabilitation and in reducing the risk of recidivism.   Hughes expressed concern about the potential for former extremists to be re-radicalized in prison and commented on the lack of de-radicalization programs currently in place in America's prison systems.  *See id.* at 27:21–30:3.  He concluded that supervised release, rather than incarceration, would increase defendant's chances to be rehabilitated.

COURT: Well, can that system [of reducing the risk of recidivism] be best developed during supervised release or during incarceration?

MR. HUGHES: Your Honor, I'm not aware of any systematic approach for individuals in jail with these charges. In fact, in many ways individuals I've interviewed that have been in jail essentially go back to the same networks and extremist beliefs. There the Bureau of Prisons officials are struggling with that question. Do you spread these individuals out into different prisons where they potentially could radicalize others or do you put them altogether? If you put them all together what does that mean for relapse and removal from radical beliefs. If the court were to consider those two options, we need to weigh those two and require some level of monitoring and social services.

COURT:  Well, considering this defendant alone, but with the background that you both have, extensive background in these fields, does the kind of supervision and assistance in rehabilitation require -- I'm not asking you to make the sentence but just to give me your expert opinion -- does that kind of case that we have before us require incarceration?

MR. AYAD:  I can't -- I don't know if I can make that judgment based on the information that I have. But my understanding is that if everything in regards to the disengagement, the working with authorities, being a public face is very important as well, publicly countering the group's ideology, which the defendant has done through media appearances is also somewhat of a factor to take into account. Incarceration in the United States depending on just as Mr. Hughes alluded to, there is no specific set of programming that can assist individuals in developing resilience to falling back into extremist sort of beliefs. If anything, sometimes the system

pushes individuals further -- they feel persecuted, solidifying some of their beliefs. I can't make that judgment call.

COURT:  With respect to this issue of persecution as a feeling, would that inhibit the reentry into a legal life?

MR. AYAD:  The feeling of persecution inhibits an individual from being released or being reintegrated into society? I think on every level individuals have a feeling of persecution, a feeling as if the world is coming down on them. Other individuals have a heightened sense of persecution, in which the government is out to get me and people like me, which allows them to latch on to beliefs that provide solutions to those issues. Technically it depends. It needs to be assessed is what I am saying.

THE COURT:  What's your view of this issue, Mr. Hughes?

MR. HUGHES:  I would share many of my colleague's views on this. The question on sentencing, I would defer to the wisdom of the court. The question is both justice and deterrence. But *on the narrow question of rehabilitation I think a lot of those issues could be achieved primarily through supervised release*. In fact, *will more likely be achieved when individuals leave incarceration*. As it currently stands there are very few, if any, programs within prison for this very small population set.

*Id.* at 27:21–30:3 (emphasis added).

III.     Sentencing Guidelines and Statutory Sentencing Requirements

        A.  Guideline Calculation

        Defendant's charges are grouped for guideline calculation purposes.  The base offense level is 26.  PSR at ¶ 19.  Twelve levels were added because the offense involved terrorism and two levels were added because the defendant's conduct supported the commission of violent acts.  *Id.* at ¶¶ 20-21.  The offense level was reduced by three for acceptance of responsibility and timely notification of guilty plea.  *Id.* at ¶¶ 26-27.  The total adjusted offense level is 37.

        Despite his lack of criminal history, defendant's criminal history category is VI.  Section 3A1.4(b) of the Guidelines applies because the offense "involved, or was intended to promote, a federal crime of terrorism."  U.S.S.G. § 3A1.4 & comment n. 1; *see* 18 U.S.C. § 2332b(g)(5); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (finding that a person may commit an

offense involving a federal crime of terrorism "even if influencing or retaliating against government is not his personal motivation.").

The imprisonment range under the Guidelines is 360 months to life.  *But see* Part III.B, *infra* (discussing restricted Guidelines range).

### B.  Statutory Sentence

At the time of defendant's arrest and guilty plea, a charge of providing material support to a foreign terrorist organization had a maximum prison term of 15 years.  *See* 18 U.S.C. § 2339B.  A charge of receiving military-type training from a foreign terrorist organization has a mandatory prison term of ten years.  18 U.S.C. § 2339D.  Defendant faces a total statutory maximum prison term of 25 years.

Because defendant's combined statutory maximum sentence is 25 years, the defendant's restricted imprisonment range under the Guidelines is 300 months.   Absent a 5K motion from the government, the defendant would be facing a mandatory minimum of ten years in prison. *See* 18 U.S.C**.** § 2339D.

### C.  5K1.1 Letter

On June 8, 2018, the government submitted a motion, pursuant to Section 5K1.1 of the Guidelines and 18 U.S.C. § 3553(e), informing the court of the substantial assistance provided by the defendant.  The government's 5K1.1 letter permits the court to depart from the statutory minimum sentence and Guidelines range.

At sentencing, the government recognized its special interest in protecting the public from terrorism.  The government's position, outlined in its 5K1.1 letter, was based on the specific facts of defendant's case, as well as its current and future responsibilities to public safety.

At the outset in counterterrorism we have one clarifying principle and it is public safety and that remains the government's most important concern in this case as well as every other case, judge. . . .  Until four months ago I had the privilege of the leading the office's counterterrorism section where prosecutors in that section in partnership with our colleagues in the joint terrorism task force in numerous cases stood up in this courthouse and stood up and asked for sentences, including a life sentence, when the government's view was that incapacitation was necessary for public safety.

We have never hesitated to do that, judge. We've prosecuted members of ISIS and Al Qaeda and other violent terrorist organizations ruthlessly and will continue to do that. But, your Honor, every case, as you know, has to be looked at on its specific facts and in this case, your Honor, looking forward to the future and our future responsibilities for public safety, this defendant while he committed a crime in providing material support to ISIS, that there is no crime we take more seriously, judge, there's no crime we take more seriously than that. You have to keep an open mind and we have what a defendant brings to the table through the cooperation process and you have to keep an open mind about what ultimately in our humble opinion is going to be best for the public safety.

In the approximately four years since I've known the defendant we have put him in increasingly pressurized situations and that was intentional. Some of the situations he was involved in are not required by the terms of his cooperation agreement. His cooperation agreement did not require him to go on television. His cooperation agreement did not require him to do an intervention with a juvenile in Brooklyn. Nor did it require him to meet with numerous members of the U.S. government and outside academics and other experts. We've watched him closely and we've developed over time and with great caution and I really need to emphasize that, with great caution, we have developed trust in him over time that has been tested to some degree.

No one can predict the future. I agree with [defense counsel] that this is a complicated case and he's a complicated individual. While we are making no specific sentencing recommendation I think your Honor needs to know from us that this is a category of case we take seriously. Every decision that we have made in this case has been focused on an end of public safety. He's a sympathetic defendant. The government's position is not based on sympathy for this defendant. It's based on our assessment of the 3553(a) factors and among those the most significant, the potential need to protect the public from the future crimes of the defendant.

Hr'g Tr. 52:23–54:22, June 27, 2018.

IV.    Law

       A.  Minimum Guideline and Statutory Minimum

When the government makes a motion pursuant to Section 5K1.1 of the Guidelines, a district court may, in its discretion, impose a sentence below the statutory minimum sentence and Guidelines range.  18 U.S.C. § 3553(e); *see also United States v. Woltmann*, 610 F.3d 37, 40 (2d Cir. 2010) (noting that a district court must consider both a 5K1.1 letter and the factors enumerated in 18 U.S.C. § 3553(a) when determining a sentence).  The court shall state its reasons for "imposition of the particular sentence."  18 U.S.C. § 3553(c); *see generally United States v. Booker*, 543 U.S. 220 (2005).  Reasons must be stated in open court, as well as "with specificity in a statement of reasons."  18 U.S.C. § 3553(c)(2).  "The court shall impose a sentence sufficient, but not greater than necessary, to comply" with the policy of the sentencing statutes and Guidelines.  18 U.S.C. § 3553(a).

### B.   Sentencing for Similar Crimes in the United States

In the mid-1990s, the United States adopted two federal statutes, 18 U.S.C. §§ 2339A and 2239B, criminalizing the material support of a designated foreign terrorist organization.  Charles Doyle, Cong. Research Serv., R41333, *Terrorist Material Support: An Overview of 18 U.S.C. §2339A and §2339B* (2016).  These material support statutes have been interpreted broadly, giving the government substantial leeway to prosecute individuals who travel to a foreign country intending to join a foreign terrorist organization.  Alexander Meleagrou-Hitchens et al., *The Travelers: American Jihadists in Syria and Iraq*, The George Washington University Program on Extremism at 8 (Feb. 2018); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (upholding 18 U.S.C. §§ 2339A while noting the far-reaching nature and the political complexity of the term "material support").

As of February 2018, ISIS-related material support prosecutions in the United States have had a 100% conviction rate.  Meleagrou-Hitchens et al., *supra*, at 8.  There have been at least

862 individuals prosecuted for terrorism-related charges since the September 11, 2001 attack on

the United States. *Trial and Terror*, The Intercept, https://trial-and-terror.theintercept.com/ (last

updated July 20, 2018). Of these 862 prosecutions, 435 involve a charge of providing material

support to a terrorist organization and ten were for receiving military training from a terrorist

group. *Id.*

A recent study by the George Washington University's Program on Extremism found

twelve cases of Americans who returned to the United States after travelling to join a jihadist

group in Syria or Iraq since 2011. Meleagrou-Hitchens et al., *supra*, at 2. Eight returnees have

been convicted or pled guilty to criminal charges; the average sentence was approximately ten

years in prison. *Id.* at 76.

The three returnees charged with material support received the longest terms of

incarceration; Abdirahman Sheik Mohamud received 22 years, Mohamad Khweis 20 years, and

Sinh Vinh Ngo Nguyen 13 years. *Id.*

Abdirahman Sheik Mohamud traveled to Syria in 2014, received training from ISIS

soldiers and plotted to kill American troops upon his return to the United States. Matt

Zapotosky, *Ohio Man Who Trained with Terrorists Overseas and Plotted to Kill U.S. Troops

Sentenced to 22 Years*, Washington Post, Jan. 22, 2018. Mohamud pled guilty to charges of

material support and giving a false statement involving international terrorism. *Id.* He was

sentenced to 22 years in prison. *Id.* Since 2011, Mohamud is apparently the only jihadist

traveler that has returned from Syria or Iraq with the intent to commit a domestic terror act.

Meleagrou-Hitchens et al., *supra*, at 71.

Mohamad Khweis, another former ISIS member, received a 20-year prison sentence after

being found guilty of two-terrorism related counts, including a material support charge, and a

weapon charge by a jury in the Eastern District of Virginia.  Rachel Weiner & Ellie Silverman,

*He Joined the Islamic State, then Fled.  Now He's Been Sentenced to Prison for 20 years*,

Washington Post, Oct. 27, 2017.  In 2015, Mohamad Khweis sold his belongings and left his

stable, secular family behind to join ISIS.  *Id.*  He regretted his decision as soon as he arrived in

Syria and escaped just three months later.  *Id.*

Sinh Vinh Ngo Nguyen traveled to Syria for five months to fight with rebel forces against

the Bashar al-Assad regime.  Matt Hamilton, *Sinh Vinh Ngo Nguyen Sentenced to 13 Years for

Trying to Aid al-Qaeda*, The Christian Sci. Monitor, June 30, 2014.  During this time, he

attempted to join Al Qaeda, but the group refused to accept him.  *Id.*  Nguyen later planned to

travel to Pakistan to train Al Qaeda fighters, but he was arrested in California prior to his

departure.  *Id.*  Nguyen was charged with attempting to provide material support to a foreign

terrorist organization; he received a sentence of thirteen years in prison and ten years of

supervised release.  *Id.*

Others have received shorter sentences, including three returning jihadists sentenced for

making false statements to the FBI about terrorism: Bilal Abood, Daniela Greene, and Mohamad

Saeed Kodaimati.  Abood received a four-year term of incarceration after he claimed his trip to

Syria was to fight the Al-Assad regime, but he made social media posts declaring allegiance to

ISIS leader Abu Bakr-al Baghdadi.  U.S. Dep't of Justice, *Iraqi-Born U.S. Citizen Sentenced to

48 Months in Prison for Making False Statements to the FBI* (May 25, 2016),

https://www.justice.gov/opa/pr/iraqi-born-us-citizen-sentenced-48-months-prison-making-false-

statements-fbi.

Ms. Greene was an FBI agent who went to Syria after she fell in love with an ISIS

member but quickly realized her mistake and returned to the United States.  She was sentenced

to two years in prison and three years of supervised release.  Tresa Baldas, *FBI Translator Secretly Married Islamic State Leader,* USA Today, May 2, 2017; Judgment, *United States v Daniela Greene,* No. 14 CR 230-(01)(RC) (D.D.C. Apr. 23, 2015).

Kodaimati was sentenced to eight years in prison for misstatements he made to United States officials about his assistance to terrorist groups fighting the Assad regime in Syria.  Dana Littlefield, *Syrian Gets 8 Years for Lying to U.S. Officials About His Ties to Terrorism*, L.A. Times, Mar. 14, 2016.

Another returnee, Eric Harroun, received a short time served after reaching a plea deal for munitions exporting.  James Gordon Meek, *US Army Vet Eric Harroun, Who Fought in Syria, Died at Home,* ABC News (Apr. 10, 2014), https://abcnews.go.com/Blotter/eric-harroun-us-army-vet-fought-syria-died/story?id=23273218.

The case that bears the closest resemblance to the instant one is that of a returning Al Qaeda fighter, Bryant Neal Vinas.  In 2007, Vinas traveled to Pakistan and joined Al Qaeda. Adam Goldman, *Service to Both Al Qaeda and U.S., With Fate Hanging in the Balance*, N.Y. Times, May 15, 2017.  During his time in Al Qaeda, he attempted to launch rockets at United States personnel in Afghanistan and plotted an attack against the Long Island Rail Road.  *Id*. After he was detained in Pakistan in 2008, he became an FBI informant, taking part in over 100 interviews with the FBI and becoming a valuable asset.  *Id*.  He also helped prosecutors bring cases against several Al Qaeda operatives and denounced his prior ideology.  *Id*.

Vinas spent eight years in jail cooperating with the government while awaiting sentencing in the Eastern District of New York.  Sentencing Transcript, *United States v. Vinas*, 08-CR-0823 (E.D.N.Y. May 11, 2017).  In view of his substantial cooperation, which the court found put him at substantial risk and made him less likely to reoffend, he was sentenced to time

served of nearly nine years plus three months for conspiracy to murder United States nationals, providing material support to a terrorist group, and receiving military training from a terrorist group. *Id*. Three months were added for the defendant's protection. *See id.* at 16. The sentencing judge remarked on the considerable difficulty in fashioning a sentence that balanced the seriousness of Vinas's offense against the value of his cooperation. *Id.* at 21 ("The juxtaposition of Mr. Vinas's atrocious crimes and his remarkable post-arrest cooperation is what makes the task of sentencing Mr. Vinas so difficult.").

###### C.   Other Nations' Approach to ex-ISIS Adherents

The hazards of the destabilization of the Middle East and the rise of ISIS are not unique in the United States. Following ISIS's 2014 capture of large portions of Iraqi territory, western European countries have experienced a significant increase in Islamist attributed terrorist attacks. *See, e.g.*, *2015 Paris Terror Attacks Fast Facts*, CNN, https://www.cnn.com/2015/12/08/europe/2015-paris-terror-attacks-fast-facts/index.html (last updated May 2, 2018).

The recent, drastic decrease in ISIS-controlled territory has created a rush of foreign fighters returning to their home countries. *See* Meleagrou-Hitchens et al., *supra*, at 71. The Hague's International Centre for Counter-Terrorism report indicates that an average of 30% of foreign fighters have returned to their counties of departure since 2012. Berenice Boutin et al., *The Foreign Fighters Phenomenon in the European Union*, The Hague at 4 (Apr. 2016). Many countries in Western Europe and the Middle East share the significant security threat of substantial numbers of returning ex-foreign-fighters.

It is worth considering whether this problem requires uniformity across the various countries whose citizens may be returning from service with ISIS. Punishment and reintegration

into society can be expected to be treated in different ways in these countries and within the

United States.  The reasons are partially because of the large difference in number of ex-ISIS

fighters expected to be returning to the various countries.  In addition, penological and

correctional approaches in different countries widely vary.  Nevertheless, it might be useful for

these countries to consult with each other over what may be a substantial problem across the

world—controlling defeated ISIS members as they return to their native countries.  Set out below

are some of the approaches in the various countries.

      Western European countries have adopted laws similar to America's material support

statutes to aid in the prosecution of former ISIS members.  France approved a law in December

2012, which allows for prosecution of French nationals who attend terrorist training camps in

other countries.  Amanda Goodman, *Blocking Pro-Terrorist Websites: A Balance Between*

*Individual Liberty and National Security in France*, 22 Sw. J. Int'l L. 209, 217 (2016).  The

French penal code prosecutes the participation in any terrorist group with up to ten years in jail.

Code Pénal [C. Pén] [Penal Code] Art. 421-5.  In 2014, for example, a returnee from Syria was

convicted and sentenced to seven years in jail, after reportedly only spending twelve days in

Syria.  *Frenchman Flavien Moreau jailed for Syria jihad*, BBC News (Nov. 13, 2014),

https://www.bbc.co.uk/news/world-europe-30043965.  French President, Emmanuel Macron, is

taking a hard line approach on this issue, promising that returning male foreign fighters will be

tried and imprisoned, while women and children will be treated on a "case-by-case" basis.  Lara

Marlowe, *Macron Declares Victory over Islamic State Two Years after Paris Attacks,* The Irish

Times, Nov. 9, 2017.

      Germany enacted new ant-terrorism legislation in 2015.  Jenny Gesley, *Germany: New*

*Anti-Terrorism Legislation Entered into Force*, Global Legal Monitor (July 10, 2015),

http://www.loc.gov/law/foreign-news/article/germany-new-anti-terrorism-legislation-entered-into-force/.  The law punishes individuals who receive terrorist training or who travel outside of Germany with the intent to receive terrorist training with up to ten years in prison.  *Id.*  It allows authorities to prevent German citizens who pose an international security threat from leaving the country by revoking their passports and national identity cards.  *Id*.

Great Britain criminalizes membership in a proscribed terrorist group with up to a ten-year prison term.  U.K. Home Office, *Proscribed Terrorist Organizations* at 3 (Dec. 22, 2017), https://www.gov.uk/government/publications/proscribed-terror-groups-or-organisations--2; Terrorism Act 2000, c. 11, § 11.  Individuals who attend a place used for terrorist training face up to ten years in prison.   Terrorism Act 2006, c. 11, § 8.  It allows revocation of citizenship in some cases; approximately eighty-four foreign fighters lost their citizenship between 2006 and 2016.  David J. Trimbach & Nicole Reiz, *Unmaking Citizens: The Expansion of Citizenship Revocation in Response to Terrorism*, Ctr. for Migration Stud., Jan. 30, 2018.

Other European countries take a more moderate approach.  In Belgium, for example, ex-jihadist fighters returning from Syria generally face three to five years in prison.  Thomas Renard & Rik Coolsaet, *How Belgium Overcame the Threat from Returning Foreign Terrorist Fighters*, Royal United Serv. Inst. (Mar. 22, 2018), https://rusi.org/commentary/how-belgium-overcame-threat-returning-foreign-terrorist-fighters.

A recent case in the Netherlands illustrates the social and political tension surrounding the prosecution of foreign fighters who return home.  In September 2015, Laura H., together with her husband and two small children, left the Netherlands to join ISIS.  Anna Paganini, *Split verdict on Dutch jihad mother who brought kids to Syria*, NL Times, Nov. 13, 2017.  Quickly realizing that the reality of her life in ISIS territory was far from what she had imagined, the

defendant coordinated her escape with, and was picked up by, Kurdish authorities while in the desert with her children.  *See id*.; Janene Pieters, *Report: Dutch Woman Abandoned Wounded Husband in ISIS Territory*, NL Times, July 19, 2016.  When she returned to the Netherlands, she was arrested and prosecuted under Dutch law.  Paganini, *supra*.  While the court ruled she had aided terrorism by moving to ISIS controlled territory, it found 11 months of pre-trial detention and 13 months of probation adequate.  *Id*.

Middle Eastern countries have formulated individual approaches to this problem.  Iraq has employed a harsh system in which detainees are hurried through quick trials in special counterterrorism courts.  Margaret Coker & Falih Hassan, *A 10-Minute Trial, a Death Sentence: Iraqi Justice for ISIS Suspects*, N.Y. Times, Apr. 17, 2018.  These trials, which sometimes last only ten minutes, often result in death sentences and have a 98% conviction rate.  *Id*.

Saudi Arabian law imposes strict consequences for crimes related to terrorism, including death for certain offenses, and contains a "vague and overly broad definition[ ] of acts of terrorism."  Human Rights Watch, *Saudi Arabia: New Counterterrorism Law Enables Abuse* (2017), https://www.hrw.org/news/2017/11/23/saudi-arabia-new-counterterrorism-law-enables-abuse.  This country has created a prison for former jihadists that focuses on rehabilitation through familial involvement, re-education, and rewards for good behavior.  Hanna Kozlowska, *Saudi Arabia is Rehabilitating Jihadis in a Lavish Prison*, Quartz (Jul. 20, 2017), https://qz.com/1028597/saudi-arabia-terrorism-rehabilitation-plan-includes-a-lavish-prison-with-family-time/.

In Kurdish controlled Syria, the groups which have been fighting directly against ISIS on the battlefield are taking a relatively lenient approach.  The newly established Kurdish terror courts can give a maximum sentence of 20 years and are strongly focused on rehabilitation

through reeducation in prisons called "academies."  Associated Press, *Syria's Kurds Put ISIS on Trial With Focus on Reconciliation*, Haaretz, May 8, 2018.  They consider each defendant's factors closely in determining the appropriate sentence.  For example, a fighter who joined as a teenager and voluntarily surrendered was sentenced to two years and nine months in an academy. *See id.*; *but see* Ben Hubbard, *Wives and Children of ISIS: Warehoused in Syria, Unwanted Back Home*, NY Times, July 4, 2018 ("They are among the more than 2,000 foreign women and children being held in [detention camps in northeastern Syria], trapped in a legal and political limbo with no foreseeable way out.  Their home countries do not want them back, fearing they could spread radical Islamist ideology. The Kurdish authorities that administer this stateless war zone do not want them either . . .").

V.      18 U.S.C. § 3553(a) Considerations

A sentence must "consider all of the § 3553(a) factors . . . [and] make an individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also* 18 U.S.C. § 3553(a) (the court is instructed to consider the traditional sentencing factors of retribution, deterrence, rehabilitation, and public safety, as well as the "nature and circumstances of the offense" and the "characteristics of the defendant").  Defendant's unusual and complicated personal history makes his sentencing especially difficult and requires the court to consider myriad vectors.

A.  Nature of the Offense and Characteristics of the Defendant

There is no doubt that defendant committed a serious offense.  In June 2014, Doe left his home in America to travel overseas and join the "most brutal [terrorist] organization in the world."  Hr'g Tr. 15:24–17:4, June 27, 2018; *cf.* Tanisha M. Fazal, *Religionist Rebels & the Sovereignty of the Divine*, 147 Daedalus: J. Am. Acad. of Arts & Sci. 25, 33 (2018) ("Religionist

35

rebels['] . . . aims are often without limit, their means are frequently brutal, and attempts at negotiation may be futile."). He remained with ISIS for four months. There he received military training and was present in at least one battle.

The seriousness of defendant's offense must be weighed against his extraordinary cooperation with law enforcement over the past four years. *See* Part II.F, *supra*. The government reports that defendant's cooperation has been critical in several ISIS-related prosecutions and has supported numerous investigations and counterterrorism measures by the United States and its allies. Defendant's cooperation has come at significant risk to his own and his family's safety, a danger that he will continue to face.

In addition to providing material support to United States' ongoing counterterrorism efforts, Doe has shown a willingness to speak openly about his experience in ISIS in order to educate the public about the terrorist group and counter ISIS's false messages. *See* Part II.F, *supra*. He has worked with the government to deter others from joining terrorist groups, including participating in the intervention of a young man in Brooklyn who was on the verge of accepting jihadism.

Defendant's background and unconventional narrative warrant consideration. *See* Part II.A–D, *supra*. He is a 29-year-old naturalized American citizen with no criminal history. He grew up in a supportive, middle-class family in Brooklyn where he enjoyed a stable childhood typical of many American adolescents.

The death of his sister and her unborn child changed the course of defendant's life. He responded by adopting a renewed commitment to his faith with increasingly violent religious views. At a particularly vulnerable time, he immersed himself in the internet, falling prey to terrorist propaganda and eventually finding himself drifting towards radicalization. *Cf.* Jaime

36

M. Freilich, *Section 230's Liability Shield in the Age of Online Terrorist Recruitment*, 83 Brook. L. Rev. 675, 675 (2018) ("ISIS [social media] propaganda is crafted not just to stir the hearts of potential recruits but also to boost the organization's ghastly brand.") (internal quotations omitted); Alan Feuer, *One Brooklyn Man's Lonely Journey to Jihad*, NY Times, Jan. 4, 2018 ("Young and lost in modern America . . . [he] took to the internet, immersing himself in religious videos and ultimately embracing the Islamic State.") (internal quotations omitted). Doe's decision to travel to Syria was primarily motivated by a desire to live in a utopian Islamic environment, rather than a desire to commit violence on the group's behalf. He was immediately disillusioned with the group and escaped after just four months in ISIS camps, surrendering to United States authorities and beginning a four-year period of cooperation.

Since his release from prison, defendant appears to be on a path towards reintegration: living with his parents in Staten Island, reestablishing his good relationships with his siblings, graduating from a City College with a finance degree, working for a neighbor as an electrician, and dreaming of settling down one day soon and starting a family of his own. *See* Part II.G, *supra*.

### B. Deterrence

General and specific deterrence play a large part in the court's considerations, particularly given the increasingly common nature of terrorism-related crimes. *See* Meleagrou-Hitchens et al., *supra*, at 12, 79 ("Since 2011, at least 50 Americans have been arrested for attempting to join IS[IS] overseas, with at least 30 more attempting to join other jihadist groups . . . [and] there have been 22 jihadist attacks in the U.S."). The sentence imposed must not only provide adequate deterrence for the defendant, but for others with similar urges.

The court has the responsibility for designing a sentence that encourages cooperation with law enforcement.   The sentence must not be so harsh that it discourages the defendant or other former extremists from coming forward and assisting the government in the future.  *See* Sentencing Transcript, *United States v. Vinas*, 08-CR-0823 at 22 ("[D]eterrence can be a double-edged sword and the Court is mindful that just as sentencing should be designed to deter criminal behavior, it should also avoid deterring cooperation.");  Adam Goldstein, *Former terrorist, and Prize Witness, Struggles to Make Ends Meet*, NY Times, Mar. 6, 2018 ("Cooperators are critical because you need an insider's views . . . It's almost essential at terrorism trials. There's only so much you can obtain and use from overseas.  The government . . . has to live up to its obligations: cooperation is a two-way street.") (internal quotations omitted).

### C.  Risk of Recidivism

The court has given serious consideration and weight to defendant's risk of recidivism, as well as to the possibility that defendant may be a "quisling," a loyal soldier of the enemy who is lying in wait, prepared to a commit violent act on behalf of ISIS or another terrorist organization when called upon to do so.

Assurances have been sought that the defendant will not fall back into his former pattern. Two experts provided insight into the various factors in the defendant's history that suggest that he is not likely to reoffend.  Noting the lack of data on terrorist recidivism rates, the experts stressed that any prediction of a former extremist's likelihood for recidivism is highly individualized and should be assessed on a case-by-case basis.   Hughes Report at 8–9; Hr'g Tr. 20:15–21:4, June 27, 2018; *see also* Nicole Hong, *Terrorists' Lives After Jail in Focus*, Wall Street J., Apr. 25, 2018 ("[W]ith limited data on recidivism for terrorism-related crimes, experts say the current system is inadequate in assessing how much of a risk these defendants pose.").

Mr. Hughes pointed to several factors that mitigated defendant's risk of recidivism:  (1) his desire to live an Islamic utopia was what apparently drove him to joining ISIS;  (2) his decision to voluntarily leave the terrorist organization and turn himself in to law enforcement; (3) his significant cooperation with the government; and (4) his participation in speaking to a young man who appeared to be going down the same dangerous as Doe had, and his willingness to speak publicly with academics, journalists, and researchers about his experiences.  *See* Hughes Report at 1-2; Hr'g Tr. 11:3–23, June 27, 2018.  Expert Ayad's testimony echoed Hughes in concluding that defendant's voluntary surrender, cooperation with the government, and willingness to publicly denounce ISIS were relevant factors mitigating the risk of recidivism. Hr'g Tr. 23:12–20, 28:17–23, June 27, 2018.

Expert Hughes included an assessment of defendant's current attitudes towards jihadism in his report, concluding that:  "Doe now appears to have rejected the zealous idealism that drove him to leave his home in the first place. As he told me, 'All the [expletive] I've been through, I don't care anymore. America is my home.'" Hughes Report at 1.

While no one can ever be sure, the court believes that defendant has recognized the severity of his crimes and is not likely to move towards violent extremist behavior.  No evidence has been presented that Doe has acted violently or expressed an intention to commit a violent act or otherwise support a foreign terrorist organization since his return to the United States.  He appeared credible and forthright at sentencing about his intention to leave his radical past behind and his desire to live a normal life.  The support he is currently receiving from his family will be critical in defendant's long-term reintegration.  *See* Raafia Raees Khan & Feriha Peracha, *Deradicalization, Rehabilitating, and Reintegrating Violent Extremists*, 238 U.S. Inst. of Peace 1, 4 (Nov. 2017) ("Familial involvement in the [deradicalization] process has consistently proven

a determinant factor in a person's overall progress. Individuals whose families visited frequently tended to adapt more quickly to their reintegrated alternative lifestyles (typically within one to three years) than those with limited familial support.").

      D.  Rehabilitation

A weighty consideration is whether defendant's rehabilitation requires further incarceration.  A lengthy prison sentence increases the risk that defendant will become embittered and regresses into radical beliefs.   The prison system can be a breeding ground for radicalization.  Islamic extremists often use "prisons to recruit new followers, reinforce the commitment of existing extremists and to network and exchange ideas with like-minded individuals."  James Brandon, *The Danger of Prison Radicalization in the West*, 12 Combating Terrorism Ctr. Sentinel 1, 1 (Dec. 2009); *see also* Hughes Report at 8.  We see this danger regularly not only with Islamic extremists, but with white supremacists, gang members, and others.  *See*, *e.g.*, SpearIt, *Spectacular or Specious? A Critical Review of the Spectacular Few: Prisoner Radicalization and the Evolving Terrorist Threat*, 39 T. Marshall L. Rev. 225, 230 (2014).

The United States has yet to develop a unified strategy to address the problem of prison radicalization; there are few deradicalization programs or initiatives in place that are targeted to rehabilitate extremists and help them reenter society as lawful individuals. *See*, *e.g.*, Hr'g Tr. 27:21–30:3, June 27, 2018;  Jessica Donati, *NYPD Analyst and Islamist He Tracked Are a Team Now*, The Wall Street J., Apr. 27, 2018 ("The U.S. lags behind its European counterparts in [counter-terrorism strategies], as it still lacks a targeted program to rehabilitate extremists and has no formal reintegration program, as dozens of convicts are set to be released in the next few years.").  Other countries have addressed this problem by adopting policies that separate

radicalized inmates from the general population.  *See*, *e.g.*, Adam Nossiter, *France Toughens Stance in Combating Radicals in Prisons and School*, NY Times, Feb. 23, 2018 ("[P]erhaps the greatest menace is in the country's prisons, and it is there that the government of President Emmanuel Macron [of France] is concentrating its fire with the changes announced on Friday aimed at isolating hundreds of radicalized inmates.").

Further incarceration will inhibit defendant's reentry into lawful life and could encourage defendant to re-engage with violent extremism.  Rehabilitation will more likely be achieved through a long term of supervised release, where he will be closely monitored by the Probation Department and can continue his cooperation with the United States government.

VI.    Sentence

Defendant is sentenced to time served of almost two years, and ten years of supervised release.  No fine is imposed because of his inability to pay one.  A $200 special assessment is imposed.

The sentence balances the serious nature of defendant's crime with his unique personal story, including his substantial assistance to law enforcement for the past four years.   Further imprisonment will not serve any legitimate penological goal; neither retribution, rehabilitation, deterrence, nor recidivism justify sentencing defendant to an additional term of incarceration. He has already served 21 months in prison, in addition to his almost two years of close supervision by Pretrial Services while released on bail.   A longer term of incarceration risks stirring up defendant's feeling of persecution and inhibiting his ability to become a lawful and productive member of society.

The sentence imposed is in the best interest of the public's safety.  Based on his individual characteristics, *see* Part II.A–G, *supra*, and expert testimony, *see* Part II.I, *supra*,

Doe's background does not reveal a substantial risk of recidivating.   General and specific deterrence are satisfied by the sentence imposed.

Supervised release is subject to the mandatory conditions listed in U.S.S.G. § 5D1.3(a) and standard conditions in U.S.S.G. § 5D1.3(c).   Additional special conditions have been imposed.  *See* U.S.S.G. § 5D1.3(d).

Defendant shall cooperate with the Probation Department's Computer and Internet Monitoring program, including allowing Probation to monitor and limit all of his electronic devices.  *See* Prob. Ltr. at 1.  He shall report to the Probation Department any and all electronic devices that he uses in his employment or at home.  *See id.*  A financial disclosure condition and a search condition are imposed.  Probation Department may enter defendant's home and place of employment without notice.

Doe is not permitted to associate with any individuals involved in any radical extremist groups, including ISIS, or any other criminal enterprise, or to frequent any location where these groups meet, unless under the direction of the government.  *See id.* at 1-2.  Nor shall defendant access any website affiliated with any radical extremist group, or any other criminal group, unless in connection with his cooperation.

Probation is required to report to this court every six months on defendant's compliance. If he does anything that leads to suspicion that he may be involved in any terrorism-related crimes or other crimes, Probation is to report to this court, the United States Attorney's Office for the Eastern District of New York, and the FBI immediately.  Defendant shall cooperate in any investigation that follows.

Defendant shall be placed in the Probation Department's low-intensity unit after two years if he demonstrates substantial grounds for believing he is rehabilitated.  Probation may

42

apply for termination of supervised release on behalf of the defendant after five years.

Defendant may apply for termination at any time.

VII.    Conclusion

Careful consideration has been given to the Sentencing Guidelines to ensure a sentence

that is "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a).


SO ORDERED.

Jack B. Weinstein
Senior United States District Judge


Dated:   August 6, 2018
         Brooklyn, New York